**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| JULIETA SUTTON, and ZENAT VAKILI, individually and on behalf of all others similarly situated,<br><br>*Plaintiffs*,<br><br>v.<br><br>SPRINGS REJUVENATION LLC,<br><br>*Defendant.* | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

Plaintiffs Julieta Sutton and Zenat Vakili (each individually a "Plaintiff" and collectively "Plaintiffs") bring this action on behalf of themselves, and all others similarly situated, against Defendant Springs Rejuvenation LLC ("Springs" or "Defendant") for violations of California consumer protection laws, as well as other common law claims. Plaintiffs seek damages, restitution, injunctive relief, attorneys' fees, and costs. The allegations herein are based on Plaintiffs' personal knowledge, the investigation of counsel, and upon information and belief.

## INTRODUCTION

1. Stem cell centers and other regenerative health providers have rapidly expanded across the United States by illegally selling unapproved stem cell products

that are regulated as drugs under federal law.[1] This "dramatic expansion in the marketplace" for illegal direct-to-consumer stem cell therapy is driven by multiple factors including profitability, effective advertising related to stem cells, and relatively low barriers to entry.[2]

2. Importantly, because stem cell treatments are not covered by insurance, individuals—very frequently seniors on fixed incomes—seeking treatment must pay tens of thousands of dollars out-of-pocket for treatment.[3]

3. To be sure, extracellular vesicles (EVs) and stem cells in general contain many natural properties that carry the potential for beneficial treatment of the future, but scientific and medical ambition does not translate to modern substantiated scientific support for beneficial clinical application.

4. Every drug and therapy approved in the United States must first go through a rigorous and lengthy process that includes clinical trials to prove both safety and effectiveness. Indeed, the process of developing reliable, repeatable, and

---

[1]Mary Ellen Schneider, *In US, Unlicensed Stem Cell Clinic Numbers Keep Climbing*, REGULATORY FOCUS (Nov. 4, 2021) https://www.raps.org/news-and-articles/news-articles/2021/11/in-us-unlicensed-stem-cell-clinic-numbers-keep-cli (last visited March 28, 2025).
[2]*Id.*
[3]*See* Louis A. Cona, *Stem Cell Therapy Cost (2024 Update)*, DVC STEM (Nov. 24, 2024), https://www.dvcstem.com/post/stem-cell-therapy-cost-2020 (last visited March 28, 2025).

effective biomedical technology is a long, expensive, and dedicated course evolving from pre-clinical to large-scale clinical trials.

5. In an attempt to avoid the cost and fast track the technology while also avoiding the expensive yet necessary scientific methodology and regulatory process, unlicensed clinics, such as Defendant, have ignored the current scientific limitations, opted against filing an FDA new drug application, and have instead elected to engage in misleading and false advertising through the false premise that regenerative science has quickly evolved and can now offer patients novel and life-changing therapies once thought impossible.

6. The current state of regenerative science is investigational and experimental. Despite decades of research, the proof of concept for EVs and regenerative stem cell therapy remains limited to pre-clinical animal studies; and the clinical trials involving EVs only demonstrate an emerging field of study with the medical community remaining entirely uncertain, which, if any, patient populations will ever benefit from stem cell therapy.[4]

7. In other words, the current state of the evidence-based science does not substantiate any expectation that certain positive results are repeatable across a broad patient population with various medical pathologies – yet Defendant and other

---

[4]Van Delen, et. al, *A Systematic Review and Meta Analysis of Clinical Trials Assessing Safety and Efficacy of Human Extracellular Vesicle Based Therapy*, J Extracell Vesicles, 2024;13:e12458

clinics have approached and marketed EV investigational products in a manner to expressly and impliedly represent to Plaintiffs and the putative class that certain regenerative benefits are repeatable and "anticipated" with EVs and umbilical cord sourced treatment.

8. Recognizing this disturbing trend, the United States Food and Drug Administration ("FDA") published a notice titled "Important Patient and Consumer Information About Regenerative Medicine Therapies."[5]

9. The FDA alerted consumers to the rampant fraud and deception in the stem cell and regenerative medicine market, stating that "if you are being charged for [regenerative medicine and stem cell therapies] or offered these products outside of a clinical trial, **you are likely being deceived and offered a product illegally**."[6]

10. Moreover, the FDA has publicly stated that there are no FDA-approved exosome products and has issued consumer and safety communications warning that products marketed as exosomes/regenerative medicine are frequently promoted with unsubstantiated claims.

---

[5]*Important Patient and Consumer Information About Regenerative Medicine Therapies*, FOOD AND DRUG ADMINISTRATION, (Jun. 3, 2021) https://www.fda.gov/vaccines-blood-biologics/consumers-biologics/important-patient-and-consumer-information-about-regenerative-medicine-therapies (last visited March 28, 2025).
[6]*Id*. (emphasis added).

11. Sadly, the FDA's words of warning have not deterred opportunists, including those that hold themselves out as healthcare providers, from peddling stem cell therapy as a miraculous cure-all targeting vulnerable populations in the process.[7]

12. The FDA has also pursued criminal enforcement and civil actions against firms that manufacture, market, and sell unapproved stem cell products, underscoring that these products are drugs under federal law and may not be legally sold without FDA approval.

13. The Ninth Circuit confirmed that these stem cell mixtures fall squarely within the Food, Drug, and Cosmetic Act's definition of a "drug," because they are "articles intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease," and are marketed with the intent to treat a host of medical conditions and affect the structure or function of the body. *United States v. California Stem Cell Treatment Ctr., Inc.*, 117 F.4th 1213, 1218–20 (9th Cir. 2024) (holding stromal vascular fraction is a "drug" under the FDCA). The court rejected the argument that providers may evade FDA oversight by characterizing these offerings as mere "practice of medicine," emphasizing that the FDA regulates the unlawful distribution of unapproved drug products regardless of how they are framed or marketed. *Id.* at 1220–21.

[7] *See United States v. California Stem Cell Treatment Ctr., Inc.,* 117 F.4th 1213, 1219 (9th Cir. 2024); *U.S. v. U.S. Stem Cell Clinic, LLC*, 998 F.3d 1302, 1304, 1310 (11th Cir. 2021).

14. State attorneys general have likewise initiated consumer-protection enforcement actions against stem cell clinics that deceptively market unapproved regenerative products directly to patients. For example, the Iowa Attorney General brought an enforcement action against stem cell providers who "advertised and sold stem cell therapy to Iowans, falsely and deceptively claiming that their services could provide relief from pain and other symptoms caused by common medical conditions," targeting older consumers through mailers and seminars promoting a "Life Without Pain!" *State ex rel. Bird v. Biologics Health, LLC,* Petition in Equity ¶¶ 1–3, No. EQCE089356 (Iowa Dist. Ct. Polk Cnty. Sept. 13, 2023). The Iowa Attorney General further alleged that disclaimers were inadequate and did not negate the illegality of selling unapproved stem cell products promoted for therapeutic benefit. *Id*. ¶¶ 143–147.

15. Defendant operates regenerative medicine clinics that advertise biologic injections—including stem-cell-derived products and exosomes—as therapies capable of promoting tissue repair, cellular regeneration, improved mobility, and enhanced health outcomes.

16. Defendant markets these treatments directly to consumers through websites, advertisements, and social media.

17. Defendant's website promotes regenerative therapies as treatments that can:

1. Stimulate cellular regeneration;
2. Improve tissue repair;
3. Enhance longevity;
4. Improve joint function and reduce pain.

18. These claims create the impression that Defendant's treatments are medically proven therapies capable of regenerating tissue and treating degenerative conditions.

19. In reality, the therapies Defendant sells are not approved by the FDA for the treatment of arthritis, degenerative joint disease, or similar musculoskeletal conditions.

20. The products and services at issue here consist of non-FDA-approved and experimental regenerative injections, including exosome therapy—comprised of stem cell–derived vesicles—and platelet-rich plasma ("PRP"), administered via direct intra-articular injection and marketed by Defendant as "stem cell" treatments.

21. The procedure involves the injection of cells derived from the umbilical cord of live, healthy birth babies via IV or directly into the knee, ankle, or as here, the shoulder.

22. To be sure, the exosome-based and stem cell–related products administered by Defendant constitute biologic products subject to regulation by the

FDA, yet Defendant has not obtained FDA approval for these products or the services in which they are used.

23. Moreover, upon information and belief, Defendant has not submitted an Investigational New Drug Application.

24. Despite this lack of regulatory approval and scientific evidence, Defendant markets these treatments as effective regenerative medical solutions.

25. Patients are charged substantial sums—often thousands of dollars—for these procedures.

26. Taken individually and collectively, the marketing and informed consent communicated that a consumer and patient could expect to experience a variety of medical benefits unsubstantiated by modern scientific research or clinical evidence.

27. As mentioned above and discussed more thoroughly below, while EVs are an area of ongoing laboratory and early-stage research, there is no clinical evidence demonstrating that vesicle-based injections regenerate joint tissue, halt the progression of osteoarthritis, or provide durable therapeutic benefit beyond temporary symptom relief.[8]

---

[8]See FDA Consumer Alert on Regenerative Medicine Products Including Stem Cells and Exosomes, https://www.fda.gov/vaccines-blood-biologics/consumers-biologics/consumer-alert-regenerative-medicine-products-including-stem-cells-and-exosomes

28. To be sure, the research has not supported any confirmed "anticipated benefits" with the sourcing of allografts from the umbilical cords of live, healthy birth babies for regenerative health purposes. And Defendant does not cite to any reliable or authoritative peer-reviewed literature in support of any of its claimed benefits.

29. Moreover, the statements and clinical application of the stem cell products are not generally accepted in the medical community, as the science, while certainly promising in some respects, is not advanced or reliable for use such as Defendant markets and provides.

30. Defendant's website omits the following significant limitations in the research: (a) while bone marrow and adipose-derived mesenchymal stem cells ("MSCs") have been studied related to osteoarthritis, umbilical cord harvesting is a novel source for orthopedic pain[9]; (b) the use of umbilical stem cells for regenerative medicine remains experimental with the peer-reviewed literature limited to animal studies, small sample sizes, single-center designs, and short-duration trials; (c) any conclusions or opinions have been drawn from a limited source of science; (d) any relied upon studies are limited by significant heterogeneity related to the harvest source, manufacturing processes, dosage, administration routes, injection

[9]Dhillon, et al. Umbilical Cord Derived Stem Cells for the Treatment of Knee Osteoarthritis, A Systematic Review. Ortho Journ of Sports Med. 10(7), (2022).

techniques, and end points; and (e) there are no randomized controlled human clinical studies addressing regenerative effects or benefits for which Defendant focuses its treatments.

31. Defendant's representations and omissions are material to consumers like Plaintiffs when deciding whether to purchase costly regenerative services and products. Plaintiffs and the Class paid substantial sums of money for treatments and products marketed as capable of addressing chronic and progressively worsening joint pain and functional limitation, but they did not receive the advertised benefits.

32. Plaintiffs purchased such treatments from Defendant after reviewing Defendant's marketing materials and representations.

33. Plaintiffs bring this action, asserting statutory and common law claims on behalf of themselves and all others similarly situated to seek redress from the damage inflicted by Defendant's systematic, deceptive, and fraudulent advertising and practices.

34. In addition to monetary relief, Plaintiffs seek injunctive and equitable relief to stop Defendant's misleading advertising and illegal sale of a non-FDA-approved service and drug.

35. Finally, Plaintiffs' claims are not based on, and do not seek to privately enforce, any duty created by the Federal Food, Drug, and Cosmetic Act ("FDCA"). Rather, Plaintiffs' claims arise independently under Georgia consumer protection

law and common law and are predicated on Defendant's affirmative misrepresentations and omissions made to consumers in commercial marketing materials, which are actionable regardless of whether the underlying product is subject to federal regulatory oversight.

## PARTIES

36. Plaintiff Julieta Sutton is a resident of California and an individual who sought treatment from Defendant Springs Rejuvenation for chronic bilateral knee pain and osteoarthritis.

37. Plaintiff Zenat Vakili is a resident of New York who sought treatment from Defendant Springs Rejuvenation for chronic orthopedic conditions, including persistent right knee pain.

38. Defendant Springs Rejuvenation LLC is a Georgia entity with a principal place of business in Atlanta, Georgia. Defendant operates regenerative medicine clinics, including in Los Angeles, California and New York City, New York, that market and sell stem cells, exosomes, platelet-rich plasma, and related regenerative therapies to consumers. Defendant markets regenerative medicine services through online advertising, social media, and in-clinic consultations. The true names and capacities of persons or entities, whether individual, corporate, associate, or otherwise, who are members of the Defendant LLC and who may be responsible for some of the claims alleged herein are currently unknown to Plaintiffs.

Plaintiffs will seek leave of court to amend this complaint to reflect the true names and capacities of such other responsible parties when their identities become known, including the members of the Defendant LLC.

## JURISDICTION & VENUE

39. This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, to 28 U.S.C. § 1332(d). The amount in controversy exceeds $5,000,000; there are over 100 class members, many of whom have different citizenship from Defendant, including Plaintiffs. Thus, minimal diversity exists under 28 U.S.C. § 1332(d)(2)(A).

40. This Court has personal jurisdiction over Defendant because it operates and is headquartered in this District and conducts substantial business in this District and purposefully directs its marketing and sales activities to consumers in this District.

41. Venue is proper in this District pursuant to 28 U.S.C. § 1391(a)(1) because a substantial part of the events giving rise to this action occurred in this District and because Defendant coordinated business operations in Georgia and its principal place of business is in this District.

## FACTUAL BACKGROUND

### A. Basic Biology: Extracellular Vesicles

42. Umbilical cord vesicles refer to the blood vesicles found in the umbilical cord, which contain hematopoietic stem cells and MSCs.[10]

43. Extracellular vesicles ("EVs")—sometimes marketed as "exosomes"—are microscopic particles released by cells that facilitate intercellular communication by transporting proteins, lipids, and genetic material. Extracellular vesicles are not living cells, do not self-replicate, and do not differentiate into cartilage, bone, or joint tissue.[11]

44. EVs, including exosomes derived from umbilical cord tissue, are the subject of scientific research exploring potential mechanisms of tissue communication and repair. Some early preclinical studies suggest that exosomes may influence cellular processes in vitro or in animal models.[12]

**B. Known Limitations in Research and Clinical Evidence**

45. While there is extensive ongoing research into extracellular vesicles, as they relate to fundamental biology, biomarker discovery, and therapeutic

---

[10]https://www.fda.gov/vaccines-blood-biologics/consumers-biologics/consumer-alert-regenerative-medicine-products-including-stem-cells-and-exosomes

[11]Bazzan, E., Tinè, M., Casara, A., Biondini, D., Semenzato, U., Cocconcelli, E., Balestro, E., Damin, M., Radu, C. M., Turato, G., Baraldo, S., Simioni, P., Spagnolo, P., Saetta, M., & Cosio, M. G. (2021). C*ritical Review of the Evolution of Extracellular Vesicles' Knowledge: From 1946 to Today*. International Journal of Molecular Sciences, 22(12), 6417. https://doi.org/10.3390/ijms22126417

[12]Petroni, D., Fabbri, C., Babboni, S., Menichetti, L., Basta, G., & Del Turco, S. (2023). *Extracellular Vesicles and Intercellular Communication: Challenges for In Vivo Molecular Imaging and Tracking*. Pharmaceutics, 15(6), 1639. https://doi.org/10.3390/pharmaceutics15061639

applications, the research to date is significantly limited in its clinical applicability due to a lack of standardization rendering extrapolation of existing data unreliable and a lack of multi-center, long-term controlled clinical trials. As a result, the scientific basis for clinical efficacy is highly speculative and largely anecdotal.

46. Stem cell research faces significant challenges with respect to controlling the study designs where "significant heterogeneity exists among the diseases in terms of pathogenesis, microenvironment regulation, and clinical outcomes which directly influences the efficacy and safety" of the EV products and the clinical applications.[13] And the medical literature widely acknowledges that "there are significant gaps in exosome research on methodology standardization, biological understanding which severely limit the reliability and reproducibility of clinical applications."

47. Most applications remain in the pre-clinical phase, and while there have been several small randomized controlled clinical trials addressing the potential efficacy of EVs in diverse pathological contexts, "significant heterogeneity exists among diseases in terms of pathogenesis, microenvironment regulation, and clinical outcomes, which directly influences the efficacy and safety of exocrine functions

---

[13]Zou Titan, et al. *Clinical Applications of Extracellular Vesicles; Recent Advances and Emerging Trends (2025),* Frontiers in Bioengineering and Biotechnology

and their clinical applications. Therefore, a one size fits all cannot be adopted in promoting their clinical applications."[14]

48. Moreover, "[a]chieving translation of EVs from the basic research to clinical application requires standardization and quality control in separation methods, characterization strategies, and clinical scale mass production."[15]

49. The medical community involved with the study of these novel products recognize numerous critical limitations and challenges with current study design and data extrapolation and comparison: (1) isolation and purification techniques remain inadequate; (2) characterization systems remain seriously insufficient; (3) the clinical administration is inconsistent yet a critical factor in determining the therapeutic efficacy and safety; (4) poor to no understanding of dose response; (5) sourcing variations; and (6) no standardization in manufacturing and testing. Only after these fundamental issues can be resolved will EV technology be in a place to provide a reliable medical basis to optimize treatment strategy, predict efficacy, mitigate risks, and move EVs from the current basic research phase to clinical application and mass scale production.

50. Indeed, no vesicle-based product has been approved or authorized by the U.S. Food and Drug Administration for the treatment of arthritis, joint

[14] *Id.*
[15] *Id.*

degeneration, cartilage repair, or musculoskeletal disease, and Defendant does not disclose this fact in its marketing materials or informed consent.

51. By using scientific-sounding terminology such as “regenerative,” “cellular regeneration,” and “stem cells,” Defendant creates a false and misleading impression of medical legitimacy and proven efficacy, particularly when directed at older consumers seeking to avoid surgery or long-term pain.

52. Defendant highlights the source in an attempt to appear that sourcing from live children offers a better chance of regeneration. But at no point does Defendant highlight the quality control methods or testing necessary to demonstrate consistent volume of stem cells and consistent dosing across the lots of EVs.

53. These representations and omissions related to the limitations of the science are material to reasonable consumers, including Plaintiffs, because they directly concern the nature, quality, character, effectiveness, and anticipated results of the services and products Defendant sells at substantial out-of-pocket cost.

**C. Lack of FDA Approval and Scientific Support**

54. The FDA has approved only limited stem cell therapy involving blood-forming stem cells for specific hematologic conditions like leukemia. Approved stem cell products have demonstrated reliable and consistent manufacturing processes and clinical efficacy for specific indications through clinical trials.

55. No vesicle, exosome, or similar extracellular vesicle product sourced from umbilical cords has received FDA approval for indications related to regeneration of joint tissue, or reversal of osteoarthritis in humans.[16]

56. To be sure, the FDA has issued public alerts and guidance emphasizing that regenerative medicine products—including stem cells and exosomes—must be approved or authorized before being marketed as therapies for disease treatment, and that patients should report adverse events associated with such products.[17]

57. Moreover, the body of peer-reviewed studies has not demonstrated that vesicle injections provide superior or lasting benefits compared to conventional treatments such as corticosteroid injections, physical therapy, medication, or surgery.

58. As such, by all measures, vesicle-based products such as the ones Defendant markets and sells for joint repair, pain relief, cartilage regeneration, or

---

[16] *Id.*
[17] https://www.fda.gov/vaccines-blood-biologics/consumers-biologics/consumer-alert-regenerative-medicine-products-including-stem-cells-and-exosomes

"cellular regeneration" remain experimental and unproven. These products are "drugs" under the Food, Drug, and Cosmetic Act because they are articles intended for use in the cure, mitigation, treatment, or prevention of disease and are promoted to affect the structure or function of the body. See 21 U.S.C. § 321(g)(1); *United States v. California Stem Cell Treatment Ctr., Inc*., 117 F.4th 1213, 1218–20 (9th Cir. 2024) (holding stromal vascular fraction is a "drug" under the FDCA when marketed for therapeutic treatment).

59. Accordingly, the commercial marketing and sale of such unapproved regenerative products for therapeutic use—outside of FDA authorization—is unlawful, regardless of any disclaimer that the products are "non-FDA approved." The FDA has expressly warned that "if you are being charged for [regenerative medicine] products or offered these products outside of a clinical trial, you are likely being deceived and offered a product illegally." *State ex rel. Bird v. Biologics Health, LLC*, Petition in Equity ¶ 3, No. EQCE089356 (Iowa Dist. Ct. Polk Cnty. Sept. 13, 2023).

**D. The Sale of Non-FDA-Approved Stem Cell Products Violates Federal Law.**

60. Defendant's conduct is unlawful under the Federal FDCA, which prohibits the commercial distribution of unapproved drug products. Under the FDCA, a "drug" includes any "article[] intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease" or "intended to affect the structure

or any function of the body." 21 U.S.C. § 321(g)(1). Stem cell and vesicle-based products marketed for joint repair, pain relief, cartilage regeneration, or "cellular regeneration" fall squarely within this definition because Defendant promotes them for therapeutic treatment of disease and to alter bodily structure and function.

61. The Ninth Circuit has confirmed that such regenerative products are subject to FDA regulation as drugs. In *United States v. California Stem Cell Treatment Center, Inc.*, the court held that a stem cell mixture marketed for therapeutic purposes constituted a "drug" under the FDCA, emphasizing that products promoted to treat medical conditions and affect the body's structure or function are regulated articles requiring FDA oversight. 117 F.4th 1213, 1218–20 (9th Cir. 2024).

62. Federal law further makes clear that no "new drug" may be introduced or delivered for introduction into interstate commerce unless the FDA has approved it. 21 U.S.C. § 355(a). The FDCA also prohibits the introduction into interstate commerce of any unapproved drug product. 21 U.S.C. § 331(d). Accordingly, the marketing and sale of regenerative stem cell products for therapeutic use—absent FDA approval—is unlawful.

63. The FDA has repeatedly warned consumers and providers that regenerative medicine products offered outside of clinical trials are likely being sold illegally. As one state enforcement action summarized FDA's position: "if you are

being charged for [regenerative medicine] products or offered these products outside of a clinical trial, you are likely being deceived and offered a product illegally." *State ex rel. Bird v. Biologics Health, LLC*, Petition in Equity ¶ 3, No. EQCE089356 (Iowa Dist. Ct. Polk Cnty. Sept. 13, 2023).

64. Nor can Defendant evade federal law through disclaimers or by labeling its offerings as "non-FDA approved." State enforcement authorities have likewise recognized that such disclaimers are inadequate to overcome the deceptive net impression created by marketing unapproved stem cell interventions as effective treatments, and they do not nullify sellers' affirmative legal obligations. *Id.* ¶¶ 143–147.

65. Moreover, courts have recognized that deceptive marketing of stem cell "therapies" is independently actionable under consumer protection and fraud principles. As explained in *Moorer v. Stemgenex Medical Group, Inc.*, stem cell providers may be liable not only for statements that are outright false, but also for advertising that is "actually misleading or which has a capacity, likelihood or tendency to deceive or confuse the public" under the reasonable-consumer standard. No. 316CV02816, 2017 WL 1281882, at *8 (S.D. Cal., Apr. 6, 2017).

66. In short, Defendant's commercial promotion and sale of non-FDA-approved stem cell and vesicle-based products violates federal law.

67. These products are regulated drugs under the FDCA, require FDA approval before being marketed to patients, and their distribution—coupled with misleading therapeutic claims—is unlawful regardless of any disclaimer or attempt to characterize them as merely "experimental" regenerative care.

**E. The Proliferation of "Providers"**

68. Illegal regenerative medicine clinics have proliferated nationwide, driven by high profit margins and intentional misinterpretation of the regulatory framework.

69. Many of the unscrupulous clinics rely on testimonials, celebrity anecdotes, and vague scientific language to obscure the experimental nature of their treatments, while expressly and impliedly promoting non-existent clinical benefits.

70. Older adults, like Plaintiffs, are particularly targeted due to their desire to avoid surgery and manage chronic pain.

71. Commentators have noted the "urgent need to raise awareness of discrepancies between what is being marketed and offered to patients and the clinical evidence and regulatory landscape for stem cell therapies."[18]

72. These providers often obfuscate the fact that the stem cell therapies offered are violating federal law and are not backed by sufficient scientific evidence. Instead, these providers use testimonials from former patients whose stories cannot

---

[18] *Id.*

be verified.[19] Another common tactic is to tout celebrity endorsements of stem cell treatments to create a veneer of legitimacy and obscure the experimental nature of most treatments.[20]

73. Unscrupulous providers often target patients who are desperate to avoid the risks of joint replacement surgery or a similarly invasive procedure. In the midst of this understandable anxiety, stem cell providers purport to offer a silver bullet via unproven, expensive stem cell treatments that are neither covered by insurance plans nor documented to have any significant advantages over other non-surgical treatments.[21] To make matters worse, many of the individuals targeted by these providers are elderly and especially financially vulnerable.

**F. Defendant's "Regenerative" Services & Products**

74. Defendant operates clinics that market and provide regenerative medicine treatments, including stem cell therapy, exosome therapy, PRP, peptide therapy, and other biologic interventions. Defendant advertises these treatments through its website, https://springsrejuvenation.com,/ and social media as advanced

---

[19]https://theconversation.com/stem-cell-therapies-why-theyre-expensive-unproven-and-often-dangerous-206548
[20]https://ipscell.com/2023/01/desperately-seeking-stem-cells-celeb-quests-for-elixirs-mislead/
[21]https://pmc.ncbi.nlm.nih.gov/articles/PMC7002842/pdf/BJJ-102B-148.pdf

regenerative therapies designed to promote healing, longevity, and enhanced performance.[22]

75. Defendant promotes its therapies as treatments capable of improving health, longevity, and physical performance.

76. Defendant advertises programs designed to enhance "cellular health" and "age management."

77. Defendant's website describes regenerative therapies as capable of activating cellular repair mechanisms and improving tissue regeneration.

78. Defendant also promotes proprietary regenerative protocols that allegedly improve vitality and optimize physical recovery.

79. Defendant markets its services as "regenerative medicine," a term that, to reasonable consumers, conveys the ability to repair, restore, or regenerate damaged tissue, rather than merely manage symptoms. Defendant's website describes these treatments collectively as promoting healing, regeneration, and recovery, reinforcing the impression that the combined services will produce cumulative or synergistic therapeutic effects.

80. These marketing materials convey that Defendant's treatments are medically effective regenerative therapies.

---

[22]See Defendant's Website, (https://home.springsrejuvenation.com/)

81. Defendant also advertises exosome-based therapies derived from stem cells.

82. Defendant claims these biologic products contain regenerative signals capable of stimulating healing.

83. Defendant promotes regenerative therapies as alternatives to conventional medical treatments.

84. Defendant markets these therapies for conditions including:

a. Joint pain

b. Arthritis

c. Degenerative joint disease

d. Musculoskeletal injuries.

85. Defendant made these claims related to umbilical cord vesicles despite the FDA's explicit warnings that such treatments are neither approved for treatment of, nor proven to ameliorate such symptoms and conditions.[23]

86. These claims create the impression that Defendant's therapies are effective medical treatments.

[23] *Consumer Alert on Regenerative Medicine Products Including Stem Cells and Exosomes*, FOOD AND DRUG ADMINISTRATION (Jul. 22, 2020) https://www.fda.gov/vaccines-blood-biologics/consumers-biologics/consumer-alert-regenerative-medicine-products-including-stem-cells-and-exosomes

87. However, no exosome therapy has been approved by the FDA for treatment of osteoarthritis or joint degeneration.

**G. Defendant's Uniform Website Misrepresentations**

88. Defendant's website is presented to the public, including Plaintiffs and putative class members, as a source of information regarding the services it offers. Defendant directs prospective patients to its website for general information about its procedures, treatment options, and frequently asked questions.

89. Throughout its website and marketing materials, Defendant uses terms such as "regenerative," "regenerative therapies," "joint support," and similar terminology to describe certain non-surgical treatment offerings.

90. Defendant markets regenerative treatments that include injections described as "stem cell" related therapies. In practice, Defendant administers intra-articular injections consisting of exosomes—vesicles derived from stem cells—often in combination with PRP, which it characterizes as regenerative treatments intended to support joint function and healing.

91. Across its website, Defendant represents that its treatment offerings are designed to support joint health and overall function, and may be associated with potential benefits such as:

a. Supporting joint mobility and function;

b. Assisting with temporary relief of joint discomfort;

c. Supporting overall joint health in individuals with degenerative conditions;

d. Promoting the body's natural healing response;

e. Supporting tissue health and recovery processes;

f. Encouraging normal circulation in treated areas; and

g. Supporting reduction of inflammation associated with joint conditions.

92. Defendant's website presents these potential benefits in general terms and in connection with individualized patient care, rather than as guaranteed medical outcomes.

93. These statements affirmatively represent to consumers that Defendant's stem cell vesicle treatments regenerate tissue, slow or halt disease progression, and meaningfully treat arthritis and joint degeneration.

94. Unfortunately, however, Defendant's claims lack a reasonable and sufficient scientific basis and are not FDA approved for Defendant's labeling, marketing, or offered medical purpose. Rather, Defendant appears to have improperly extrapolated data from limited pre-clinical studies in an effort to over-promote its services and the product by claiming a patient can anticipate benefits and efficacy without foundational scientific support.

95. Defendant presents the alleged benefits without context, qualification, or explanation of their experimental or investigational nature, creating the impression that the advertised treatments and products are established, evidence-based medical therapies.[24]

96. Defendant's use of clinical-sounding terminology is particularly misleading because it suggests that the treatments and products have been validated through rigorous medical research and regulatory oversight, when they have not.

97. By bundling multiple treatments and products under the umbrella of "regenerative medicine," Defendant further obscures the lack of evidence supporting vesicle-based regeneration and increases the perceived legitimacy and value of the overall program.

98. Defendant's marketing emphasizes avoidance of surgery and pharmaceuticals, repeatedly positioning its services as a non-invasive alternative for patients suffering from arthritis and chronic joint pain.

99. These messages are particularly appealing to older adults experiencing age-related degeneration who are fearful of surgical intervention or long recovery periods.

[24] *Id.*

100. Defendant markets its regenerative medicine services and products as premium, specialized treatments not covered by insurance, requiring patients to pay significant sums directly.

101. Defendant's representations regarding regeneration, healing, and avoidance of surgery are designed to justify the high cost of these services and to induce patients to proceed with treatment despite the lack of reliable evidence supporting the advertised benefits.

102. The net impression created by Defendant's marketing was that the advertised therapies were established, clinically supported regenerative treatments, notwithstanding isolated or inconspicuous statements that the procedures were "experimental." Defendant's affirmative marketing claims materially qualified, diluted, and contradicted any such disclaimers such that a reasonable consumer would not understand that the treatments were investigational, unproven, or unsupported by reliable clinical evidence.

103. Defendant used materially similar standardized website representations, consultation scripts, and informed consent documents when marketing umbilical cord vesicle treatments to Plaintiffs and members of the proposed Class. These uniform marketing practices communicated substantially the same representations regarding regenerative benefit and therapeutic efficacy to all Class Members.

### H. Defendant's Uniform Omissions from its Website & Informed Consent

104. Despite the known limitations and the investigational status of its services, Defendant's representations are presented in a manner intended to convey that its regenerative treatments—including exosome-based and stem cell–related therapies—are safe, natural, and effective alternatives to conventional medical care. While Defendant at times references individualized results or investigational status, its marketing emphasizes potential benefits and outcomes in a manner that downplays the experimental nature of the treatments and overstates their reliability and efficacy.[25]

105. Through its marketing and patient-facing materials, Defendant omits or fails to clearly and consistently disclose material scientific and medical facts regarding the use, quality, characteristics, and purported benefits of its exosome-based and stem cell–related treatments, including:

a. Exosomes are extracellular vesicles derived from cells, not living stem cells, and the presence, viability, or functional activity of any stem cells in administered products is not established;

b. There is no universally accepted standard of care governing the use of exosome-based or stem cell–related therapies in orthopedic or

[25] See, e.g., SOAP Notes (Aug. 28, 2024) (describing treatment as "experimental exosome therapy")

regenerative medicine, including no established dosing, preparation, or administration standards;

c. No exosome-based product—and no stem cell–derived biologic product—has been approved by the U.S. Food and Drug Administration to treat arthritis, joint degeneration, cartilage loss, or musculoskeletal disease, or to achieve "regeneration" or "tissue repair";

d. The therapeutic dose-response relationship for exosomes and related biologic products is not well established, including with respect to claims of cartilage restoration, disease modification, or halting the progression of osteoarthritis;

e. Claimed regenerative or restorative benefits are based largely on preclinical or early-stage research, and available human evidence is limited and does not support consistent or reliable clinical outcomes;

f. Existing clinical research does not establish that exosome-based injections regenerate cartilage, reverse degenerative joint disease, or produce predictable therapeutic outcomes in osteoarthritis or similar conditions;

g. A lack of product standardization—including variability in sourcing, processing, and composition—prevents extrapolation of limited study findings to the treatments administered by Defendant; and

h. Current medical literature does not substantiate claims that such therapies are superior to established treatments, including surgical or pharmaceutical interventions, or that they provide proven disease-modifying benefits.[26]

106. Although Defendant includes certain disclaimers on its website describing its treatments as investigational and not intended to diagnose, treat, cure, or prevent disease, these disclosures are not presented in a clear and consistent manner sufficient to counterbalance the overall impression created by Defendant's marketing regarding the effectiveness and expected outcomes of its regenerative services. Cf. SOAP Notes (Aug. 28, 2024) (acknowledging "experimental exosome therapy").

107. Defendant's omissions and partial disclosures are material to reasonable consumers because they directly concern the nature, regulatory status, quality, effectiveness, and expected outcomes of the services Defendant markets and

[26]See FDA, *Consumer Alert on Regenerative Medicine Products Including Exosomes*; See also Payment Authorization Agreement (Jan. 20, 2024) (describing injections of "stem cells; containing 100 Billion Exosomes"); SOAP Notes (Aug. 28, 2024) (documenting intra-articular injection of exosomes combined with PRP); Pre/Post Instructions (describing "MSC Stem Cell / MSC Exosome Therapy Direct Injection")

sells at substantial out-of-pocket cost, including exosome-based injections administered to Plaintiffs.[27]

**I. Plaintiff Sutton's Experience, Injuries & Damages**

108. Plaintiff Julieta Sutton is a California resident who sought treatment from Defendant for chronic bilateral knee pain and osteoarthritic knee degeneration.

109. Prior to seeking treatment from Defendant, Sutton had a documented history of significant bilateral knee pathology. Imaging of Sutton's left knee reflected meniscal tearing, medial and lateral compartment joint-space narrowing, marginal osteophytes, full-thickness chondral loss in the medial femoral condyle, and grade 3 chondromalacia patellae.

110. Imaging of Sutton's right knee later showed a high-grade complex tear of the posterior horn of the medial meniscus, marked cartilage loss in the medial compartment, moderate cartilage loss and chondral fissuring in the lateral compartment, grade 3-to-4 chondromalacia, synovitis, effusion, and bursitis.

111. Before seeking treatment from Defendant, Sutton had previously undergone other treatments for knee pain, including platelet-rich plasma therapy.

112. Concerned about pain, deterioration, and the possibility of more invasive treatment, Plaintiff researched alternatives and discovered Defendant's

[27] See Payment Authorization Agreement (Jan. 20, 2024) (reflecting payment for stem cell/exosome-based joint injections)

regenerative medicine marketing. In connection with that research and enrollment process, Plaintiff reviewed Defendant's promotional and treatment materials describing "MSC Stem Cell/MSC Exosome Therapy Direct Injection" as a treatment intended to help healing and provide "lasting benefit."

113. Defendant's written materials represented that the injected cells and/or exosomes were "fragile" and needed time to heal tissues, and that patients would typically begin noticing benefits within weeks, with more dramatic benefits at three to four months and maximal benefits by later follow-up.

114. Defendant's written materials further represented that stem cells "promote regeneration," may improve mobility, may reduce pain, and are expected to build new tissue in the treated joint over time.

115. Plaintiff's internet research did not reveal that the stem-cell or exosome-based knee treatment Defendant was selling was not approved by the U.S. Food and Drug Administration for the regenerative joint-repair uses Defendant was promoting.

116. Plaintiff reasonably reviewed and relied upon Defendant's specific representations concerning the regenerative capacity of the proposed treatment, including representations that the biologic product could reduce inflammation, help repair tissue, improve joint function, and help patients avoid more invasive procedures.

117. After learning of these regenerative medicine therapies, Plaintiff sought treatment through Defendant for her bilateral knee condition.

118. In the course of the enrollment process, Defendant evaluated Plaintiff, obtained her history, and recommended a bilateral joint injection procedure using Defendant's stem-cell/exosome product.

119. On or about January 20, 2024, Plaintiff signed Defendant's "Payment Authorization, Satisfaction, & Appointment Policy for Stem Cell Services" for a joint procedure, identifying Julieta Sutton as the patient and describing the service as direct joint injections with stem cells containing "100 Billion Exosomes." The authorization lists "2 x 5.0cc" and a total price of $13,500.

120. That written authorization further stated that, although no guarantees could be made, "most patients experience improvement." It also stated that Defendant would provide either an additional round of services at no additional charge or the patient's money back if imaging by Defendant after six months, but no more than seven months, did not show decreased inflammation or effusion, repair or attachment, tissue or cartilage resolution, or pain reduction after assessment by the provider.

121. Defendant also provided Plaintiff with a separate Springs Rejuvenation agreement stating that, if the regenerative procedure did not warrant any beneficial

results, the patient could request a refund six months after the initial procedure following a follow-up visit to assess condition and outcome.

122. In addition, Defendant provided Plaintiff written pre/post procedure instructions for "MSC Stem Cell/MSC Exosome Therapy Direct Injection," including directives to avoid NSAIDs, rest the affected joint, follow post-procedure restrictions, and allow time for the cells/exosomes to produce healing and regenerative effects.

123. The written materials Defendant had Plaintiff sign or accept did not fairly and clearly disclose, before payment and enrollment, that the treatment being marketed for knee degeneration and joint repair was investigational, not generally accepted as standard orthopedic care for the advertised regenerative uses, and not FDA approved for the regenerative representations Defendant was making.

124. Instead, the documents and instructions presented the treatment as a coordinated regenerative program intended to produce measurable biological improvement, including decreased inflammation or effusion, tissue repair, cartilage or tissue resolution, reduced pain, improved mobility, and progressive healing over time.

125. Plaintiff reasonably relied on Defendant's written and oral representations in deciding to proceed with treatment and in agreeing to pay the substantial cost Defendant demanded.

126. Defendant required substantial up-front payment before the procedure was performed. Defendant's documents stated that full payment was due before the procedure and that deposits were non-refundable.

127. Defendant's treatment package and enrollment materials were structured to secure payment in advance for the biologic procedure and related services before Plaintiff could evaluate whether the treatment would provide the promised regenerative benefit.

128. Upon information and belief, the biologic stem-cell/exosome component of the treatment was the principal driver of the package cost and was marketed as a premium regenerative therapy with the promise of repair, healing, and improvement.

129. Prior to Plaintiff's enrollment and payment, Defendant failed to adequately disclose the following material facts: (a) the use of umbilical or exosome-based biologics for orthopedic pain and joint regeneration remains experimental; (b) claims of cartilage repair, tissue regeneration, and other restorative effects are not supported by reliable, consistent human clinical evidence for the uses Defendant advertised; (c) available literature is limited and heterogeneous; and (d) the treatment was not FDA approved for the knee-regeneration uses Defendant was promoting.

130. Plaintiff relied on Defendant's representations that the injections could improve joint function, reduce pain, reduce inflammation, and promote regenerative healing in her knees.

131. Plaintiff thereafter underwent the recommended bilateral knee injection procedure through Defendant.

132. According to Plaintiff, shortly after the injections, she developed blistering and skin injury near the injection sites.

133. According to Plaintiff, during a follow-up consultation, Defendant documented hemorrhagic bullae on both knees.

134. According to Plaintiff, the blistering appeared the day after the injections, and one blister ruptured with serosanguinous discharge.

135. Plaintiff experienced pain and injury following the procedure and did not experience the regenerative benefits advertised by Defendant.

136. Although Defendant required Plaintiff to sign authorization and policy documents and provided pre/post procedure instructions, those materials did not clearly and conspicuously disclose, before Plaintiff committed to and paid for treatment, that the stem-cell/exosome therapy being sold for knee degeneration and joint repair was not FDA approved for the regenerative uses being marketed.

137. To the extent Plaintiff was shown a separate informed-consent page on or near the date of the procedure, that disclosure came only after Defendant had

already marketed the treatment as regenerative, obtained Plaintiff's agreement to proceed, and/or required her financial commitment.

138. Plaintiff requested a refund or reimbursement, and Defendant refused to refund the amounts paid or financed despite the lack of the promised benefit and despite Defendant's own written satisfaction and refund-related representations.

139. Plaintiff's experience and results were not abnormal or unexpected in light of the absence of reliable evidence that Defendant's marketed stem-cell/exosome treatment predictably delivers the regenerative and restorative benefits Defendant claimed.

140. As a result, Plaintiff paid thousands of dollars for services and procedures that did not provide the medical benefits Defendant advertised and sold.

141. At all relevant times, Plaintiff was over sixty years old, placing her within a population particularly vulnerable to Defendant's marketing emphasizing natural healing, regeneration, improved mobility, and avoidance of more invasive treatment. Plaintiff's date of birth is July 4, 1954.

142. Plaintiff would not have paid for Defendant's stem-cell, exosome, and related regenerative treatments—or would have paid significantly less—had Defendant truthfully and fully disclosed that the treatments were investigational, unapproved for the advertised uses, and unsupported by reliable clinical evidence demonstrating the regenerative benefits Defendant promised.

143. As a direct and proximate result of Defendant's misrepresentations and omissions, Plaintiff suffered economic injury, including out-of-pocket medical expenses, lost money, and the loss of the benefit of her bargain.

**J. Plaintiff Vakili's Experience, Injuries & Damages**

144. Plaintiff Vakili, also referred to in communications as Marjan Vakili, is a consumer who sought treatment from Defendant Springs Rejuvenation after suffering from chronic pain conditions, including significant knee, back, neck, and spine pain.

145. On or about June 11, 2024, Defendant confirmed Vakili's stem cell consultation and congratulated her for "taking the first step towards a healthier, more vibrant life," while encouraging her to watch materials regarding stem cells and their "incredible potential."

146. Defendant's sales representative Cody Stuht thereafter communicated directly with Vakili and her family regarding Defendant's proposed stem cell and exosome treatment plan. Defendant recommended a package consisting of two IV treatments for the back using "220 billion Stem Cell Exosomes," one direct injection for the right knee using "110 billion Stem Cell Exosomes," and one direct injection for the left knee using "110 billion Stem Cell Exosomes." Defendant quoted $8,000 for knee treatment, $15,000 for neck/back/spine treatment, $21,500 for three injections/IVs, and $27,000 for all four injections/IVs ("normally $28,000").

147. In a June 17, 2024 email, Cody Stuht touted that Defendant offers a money-back guarantee. Specifically, Stuht stated “[i]f there are no improvements at the 6 month mark, we offer a second injection at no cost to you. If after another 6 months that does not work, we will completely refund your money! We provide a “Patient Protection Policy” to ensure your confidence.”

148. Cody Stuht’s email also represented that direct injections with Mesenchymal Stem Cell exosomes are a “great alternative to surgery” because they have “regenerative, natural healing properties” and that “[b]y injecting the stem cell exosomes directly into the joint capsule, they remain concentrated in that specific location and get to work!”

149. The email also touted that IV injections with stem cells are “referred to as the fountain of youth by many patients.”

150. A separate June 17, 2024 email touted the benefits of exosome therapy, including that exosome IV infusion “has been shown to promote tissue regeneration in various health conditions, including musculoskeletal disorders and tissue damage,” can result in “enhanced cognitive function,” that “exosome IV infusion can help slow the progression of [neurodegenerative diseases like Alzheimer’s and Parkinson’s],” and can “improve skin health,” reduce recovery times, among other benefits.

151. Defendant further represented that Vakili was “locked in” to a satisfaction policy and later stated that instead of “110 Billion Stem Cell Exosomes per injection,” Defendant would provide “250 Billion,” more than double the previously described amount. Defendant also requested payment before the procedure because the materials had to be ordered and offered to reduce the total price from $27,000 to $26,000.

152. Relying on Defendant’s representations concerning the nature, power, and promised benefits of its stem cell/exosome products, Vakili proceeded with Defendant’s treatment at Defendant’s Los Angeles location on July 2, 2024.

153. After the procedure, Vakili did not experience the represented benefits. Instead, she complained that the treatment caused severe pain and complications. Approximately two months after the treatment, Vakili contacted Defendant to complain about “all my pain,” after which Defendant directed her to obtain lab work for further evaluation, but Vakili states that she did not receive the promised lab order and no meaningful follow-up occurred.

154. To help alleviate her knee pain, Vakili received chiropractic care over 17 visits from August 6, 2024 to September 24, 2024 for knee pain. She also received treatment from Agape Natural Health from Aug 16, 2024, until Sep 17, 2024.

155. Vakili continued to require medical care after Defendant's treatment. On September 5, 2024, she was evaluated by UCI Health Orthopedics for chronic right knee pain and was prescribed diclofenac.

156. On September 17, 2024, UCI Health further assessed Vakili for Baker's cyst of the right knee, degenerative tear of the lateral meniscus of the right knee, and unilateral primary osteoarthritis of the right knee.

157. Vakili's records also reflect significant pain management needs, including oxycodone prescribed as needed for pain.

158. In October or November 2024, Vakili complained to Defendant that she was not seeing relief from the treatments. In response, Defendant's representatives told her that she needed to give it more time.

159. Vakili told Defendant that, four months after Defendant's representative in Los Angeles performed the stem cell procedure, she remained in pain, had to see an orthopedic knee specialist, received injections in both knees, and was prescribed physical therapy. She further reported that the stem cell treatment caused "nothing but more pain," especially in both knees, and worsened her fibromyalgia.

160. Vakili also reported that because her pain became extremely severe and could not be controlled with medication, she consulted a pain management specialist, who recommended a pain pump; she states she saw Dr. Rajmani Krishnan

at Island Interventional Pain Management in March 2025 and underwent a procedure in May 2025 to obtain some relief and improve her quality of life.

161. Medical records from March 2025 document that Vakili presented for evaluation of bilateral knee pain, with right knee pain rated 8/10 to 9/10, and that she had been told she had “bone on bone arthritis” and needed a total knee replacement but wanted to avoid surgery.

162. Vakili subsequently underwent additional right-knee procedures, including Toradol injection and later GenVisc injections, with assessments including unilateral primary osteoarthritis, right-knee pain, stiffness, difficulty walking, and chronic pain.

163. In 2025, Vakili again complained to Defendant that she did not receive the promised benefits from her treatment.

164. In response, Defendant scheduled her for an additional injection in August 2025.

165. Vakili drove to the New York office from her residence in Long Island for the scheduled August 7, 2025 injection. While in the waiting room, Vakili reported that an unidentified woman who was one of Defendant’s employees discussed a new “live cell” treatment and warned that because the cells came from another person’s body, there could be serious side effects, including leukemia, high blood pressure, heart issues, kidney problems, lung conditions, osteoporosis, blood

clots, arthritis, and other risks. Vakili further reported that the provider admitted she had never performed joint injections before and only came to the clinic once a month. Scared by this interaction, Vakili decided not to have this individual perform her injection and left the office.

166. Vakili emailed Defendant and told its representative, Andria Bass, this story. Bass apologized for the interaction and then told her that Dr. Charles had fired this individual and that Dr. Charles himself would fly up from Florida to New York to personally do Vakili's second injection.

167. Vakili received her second injection performed by Dr. Charles in Defendant's New York office on August 22, 2025.

168. In December 2025, Vakili again complained to Defendant that she was not experiencing the promised benefits for the injections. She requested Defendant to honor its money-back guarantee and requested a full refund of the $27,000 she paid for treatment of her left knee, right knee, neck, back, and spine. She stated that the prior stem cell procedure caused severe issues, that she had lost trust in Defendant's treatment and handling of her care, and that she had medical records and documentation of the health issues and expenses she endured after the July 2, 2024 procedure.

169. Vakili left several messages with Defendant's representative, Andria Bass, whom she had previously worked with to schedule the second injection.

170. Defendant never responded to Vakili and never refunded her.

171. Had Vakili known that Defendant's treatments were experimental, not FDA-approved for the represented uses, lacked reliable clinical evidence of efficacy, and carried risks that were not adequately disclosed before payment and treatment, she would not have purchased Defendant's stem cell/exosome products.

172. Plaintiff's experience and results were not abnormal or unexpected in light of the absence of reliable evidence that Defendant's marketed stem-cell/exosome treatment predictably delivers the regenerative and restorative benefits Defendant claimed.

173. As a result, Plaintiff paid thousands of dollars for services and procedures that did not provide the medical benefits Defendant advertised and sold.

174. At all relevant times, Plaintiff was over sixty years old, placing her within a population particularly vulnerable to Defendant's marketing emphasizing natural healing, regeneration, improved mobility, and avoidance of more invasive treatment. Plaintiff's date of birth is July 8, 1957.

175. Plaintiff would not have paid for Defendant's stem-cell, exosome, and related regenerative treatments—or would have paid significantly less—had Defendant truthfully and fully disclosed that the treatments were investigational, unapproved for the advertised uses, and unsupported by reliable clinical evidence demonstrating the regenerative benefits Defendant promised.

176. To the extent Plaintiff was shown a separate informed-consent page on or near the date of the procedure, that disclosure came only after Defendant had already marketed the treatment as regenerative, obtained Plaintiff's agreement to proceed, and/or required her financial commitment.

177. As a direct and proximate result of Defendant's conduct, Vakili suffered economic loss, including the amounts paid to Defendant, as well as physical pain, worsening symptoms, additional medical expenses, emotional distress, and loss of quality of life.

## CLASS ACTION ALLEGATIONS

178. Plaintiffs bring this action individually and on behalf of the following Class:

> All persons in the United States who purchased Defendant's stem cell, exosome, or related regenerative biologic treatments within the applicable limitations period.

179. Plaintiffs additionally and alternatively bring this action on behalf of the following subclasses:

> **California Sub-Class**: All persons who, while residing in California or while present in California, purchased Defendant's stem cell, exosome, or related regenerative biologic treatments within the applicable limitations period.

**New York Sub-Class**: All persons who, while residing in New York or while present in New York, purchased or received Defendant's stem cell, exosome, or related regenerative biologic treatments within the applicable limitations period.

180. Excluded from the Class and the Sub-Classes (collectively the "Classes") are counsel for any Party, Defendant, any entities in which Defendant has a controlling interest, any judge to whom this action is assigned, and any member of such judge's staff and immediate family.

181. Plaintiffs reserve the right to modify and change these definitions as litigation evolves.

182. The Class and Sub-Classes defined above are identifiable through Defendant's business records.

**Numerosity:**

183. There are more than 100 potential members of the Classes.

184. Individual joinder of such potential members is impracticable.

185. Plaintiffs are members of the Class and their respective Sub-Class.

**<u>Commonality & Predominance</u>:**

186. There are questions of law and fact common to Plaintiffs and the proposed Class, including but not limited to the following:

a. Whether Defendant marketed stem cell therapies as a superior alternative to traditional, FDA-approved treatments;

b. Whether Defendant's marketing of stem cell therapies was false, deceptive, and/or misleading to reasonable patients;

c. Whether Defendant failed to timely and adequately disclose that the umbilical cord cell treatments it offered were neither authorized nor approved by the FDA;

d. Whether Defendant's failure to disclose that the stem cell treatments it offered were not FDA-approved was unfair, deceptive, and/or misleading;

e. Whether Defendant was unjustly enriched by the sale of stem cell therapies;

f. Whether Defendant knowingly misled patients into purchasing unproven and unapproved stem-cell therapies;

g. Whether Defendant violated state law by selling stem cell treatments with false, misleading, and deceptive representations and omissions;

h. Whether members of the proposed Class have suffered damages and, if so, the proper measure of such damages.

187. Common questions of law and fact, including the foregoing, predominate over questions affecting only individual members of the Class, and the class action device is the superior method for fair and efficient adjudication of this controversy.

188. Plaintiffs' claims are typical of the claims of members of the Class, in that they are based on the same conduct and practices of the Defendant, pursue the same legal theories, and involve the same central issues of liability.

**Adequacy:**

189. Plaintiffs are adequate representatives of the Classes because their interests do not conflict with the interests of the Classes, they will fairly and adequately protect the interests of the Classes, and Plaintiffs are represented by counsel that is skilled and experienced in class action litigation.

**<u>Appropriateness</u>:**

190. The likelihood that individual members of the Class will prosecute separate actions is remote due to the time and expense necessary to prosecute an individual case.

191. Plaintiffs are not aware of any litigation concerning this controversy already commenced by others who meet the criteria for class membership described above.

## FIRST CLAIM FOR RELIEF
## Breach of Express Contract
## (On behalf of Plaintiffs and the Class)

192. Plaintiffs repeat and re-allege the allegations in paragraphs 1- 191 as if fully set forth herein.

193. Plaintiffs and Defendant entered into an express contract pursuant to which Plaintiffs paid Defendant substantial sums in exchange for Defendant's provision of vesicle-based regenerative treatment represented as capable of providing therapeutic benefits, including joint repair, pain relief, cartilage regeneration, and "cellular regeneration."

194. Defendant expressly promised, through written and oral representations, advertising materials, consent forms, treatment plans, and other communications, that Plaintiffs would receive a legitimate regenerative medical

treatment with the represented characteristics and benefits. These were specific and material terms of the contracts.

195. Plaintiffs fully performed under the contract by paying Defendant the required amounts and complying with Defendant's treatment instructions.

196. Defendant materially breached the express contract by failing to provide the treatment and benefits promised, including by selling Plaintiffs an experimental and unapproved product marketed as a therapeutic medical intervention.

197. Defendant's performance was deficient and unlawful because the vesicle-based products marketed and sold were regulated "drugs" subject to FDA oversight and could not lawfully be sold as therapeutic treatments absent FDA approval.

198. Every contract includes an implied covenant of good faith and fair dealing requiring that neither party do anything to deprive the other of the benefits of the agreement.

199. Defendant violated this covenant by engaging in deceptive marketing and unlawful conduct that deprived Plaintiffs and Class Members of the benefit of their bargain—namely, receiving the legitimate regenerative treatment Defendant promised.

200. Defendant's conduct was undertaken in bad faith, including by omitting material facts regarding FDA approval status, experimental nature, and lack of proven efficacy.

201. As a direct and proximate result of Defendant's breach, Plaintiffs and Class Members suffered damages, including payment for treatments that were not as promised and did not provide the contracted-for benefit.

202. As a direct and proximate result of Defendant's breaches, Plaintiff and Class Members were deprived of the benefit of their bargained-for exchange and have suffered damages in an amount to be established at trial.

203. Plaintiffs and Class Members are entitled to damages, restitution, and all other relief available for breach of express contract.

**SECOND CLAIM FOR RELIEF**
**Breach of Implied Contract**
**(On behalf of Plaintiffs and the Class)**

204. Plaintiffs repeat and re-allege the allegations in paragraphs 1-191 as if fully set forth herein.

205. Plaintiffs and Defendant also entered into an implied-in-fact contract whereby Defendant agreed to provide a legitimate medical treatment consistent with Defendant's marketing representations and consistent with applicable law and professional standards.

206. Defendant, through written and oral representations, advertising materials, consent forms, treatment plans, and other communications, promised that Plaintiffs would receive a legitimate regenerative medical treatment with the represented characteristics and benefits as set forth above. Based on these representations, Plaintiffs and Class Members agreed to pay monies to Defendant for the treatments.

207. Plaintiffs and Class Members entered implied contracts with Defendant.

208. Under the implied contract, Defendant was obligated to provide services and products that were lawful, not deceptive, and consistent with the therapeutic claims Defendant used to induce payment.

209. Plaintiffs and Class Members reasonably expected they would receive the as-promised treatments.

210. Plaintiffs performed all obligations required by paying Defendant for the treatments.

211. Defendant breached the implied contract by marketing and selling unapproved and experimental vesicle-based products as effective therapeutic interventions, despite lacking FDA authorization and reliable substantiation.

212. Plaintiffs and Class Members were damaged as a result and are entitled to restitution and compensatory damages.

**THIRD CLAIM FOR RELIEF**
**Unjust Enrichment**
**(On behalf of Plaintiffs and the Class)**

213. Plaintiffs repeat and re-allege the allegations in paragraphs 1-191 as if fully set forth herein.

214. Plaintiffs bring this cause of action in the alternative to their Breach of Express Contract Claim and Breach of Implied Contract Claim.

215. Plaintiffs and Class Members conferred benefits upon Defendant by purchasing its stem cell treatments and paying a price premium for them.

216. Defendant had knowledge of such benefit. And Defendant appreciated the benefit because, were patients like Plaintiffs and Class Members not to purchase its stem cell treatments, Defendant would not generate revenue from the sale of the stem cell treatments.

217. Defendant's acceptance and retention of the benefit is inequitable and unjust because the benefit was obtained by Defendant's fraudulent and misleading representations and omissions. These misrepresentations caused injuries to Plaintiff and Clas Members because they would not have purchased the treatments if the true facts regarding the efficacy of the treatments and lack of approval by the FDA were known.

218. Defendant's misrepresentations as described above caused injuries to Plaintiffs and Class Members because they would not have purchased the treatments if the true facts regarding the treatments were known.

219. Plaintiffs and Class Members seek return of all monies Defendant acquired by way of its unlawful conduct.

220. Because Defendant's retention of the non-gratuitous benefit conferred on them by Plaintiffs and Class Members is unjust and inequitable, Defendant must pay restitution to Plaintiff and the Class Members for their unjust enrichment, as ordered by the Court.

221. Therefore, Plaintiffs pray for relief as set forth below.

**FOURTH CLAIM FOR RELIEF**
**Common Law Fraud (Intentional Misrepresentation and Concealment)**
**(On behalf of Plaintiffs and the Class)**

222. Plaintiffs repeat and re-allege the allegations in paragraphs 1-191 as if fully set forth herein.

223. Defendant made material misrepresentations, including that its vesicle-based treatments were safe, effective, and capable of regenerating tissue, repairing joints, restoring cartilage, and stopping degenerative disease progression.

224. Defendant also concealed material facts, including that no vesicle-based product has been approved or authorized by the FDA for the treatment of

arthritis, joint degeneration, cartilage repair, or musculoskeletal disease, and that the products were experimental and unlawfully marketed as therapeutic interventions.

225. Defendant knew these representations were false or misleading, or made them recklessly without regard for their truth.

226. Defendant intended that Plaintiffs and Class Members rely on these misrepresentations and omissions to purchase Defendant's expensive treatments.

227. Plaintiffs and Class Members reasonably relied on Defendant's deceptive marketing and omissions in deciding to pay for the treatments.

228. Class-wide reliance can be inferred because Defendant's misrepresentations were material, i.e., a reasonable consumer would consider them important in deciding whether to buy Defendant's treatments.

229. These misrepresentations and omissions made by Defendant, as described above, upon which Plaintiffs and Class Members reasonably and justifiably relied, were intended to and actually did induce Plaintiffs and Class Members to purchase the treatments.

230. Defendant's misrepresentations were a substantial factor and proximate cause in causing damages and losses to Plaintiffs and Class Members.

231. Plaintiffs and Class Members were injured as a direct and proximate result of Defendant's conduct because they would not have purchased the treatments if they had known that the representations were false.

232. As a direct and proximate result of Defendant's fraud, Plaintiffs and Class Members suffered damages, including out-of-pocket loss, benefit-of-the-bargain damages, and additional consequential harm.

233. Defendant's conduct was willful, malicious, and fraudulent, entitling Plaintiffs and Class Members to compensatory damages, punitive damages, restitution, and all other available relief.

**FIFTH CLAIM FOR RELIEF**
**Violation of the California Unfair Competition Law**
**Cal. Bus. & Prof. Code § 17200, *et seq.***
**(On behalf of Plaintiffs and the California Sub-Class)**

234. Plaintiffs repeat and re-allege the allegations of paragraphs 1-191 as if fully set forth herein.

235. Plaintiffs bring this claim individually and on behalf of the California Sub-Class.

236. The California Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200, *et seq.*, prohibits any "unlawful, unfair or fraudulent business act or practice" and any "unfair, deceptive, untrue or misleading advertising." Each prong is independently actionable.

237. Defendant's conduct, as described above, constitutes "business acts and practices" within the meaning of § 17200 because Defendant has engaged in the systematic, ongoing, and nationwide marketing, sale, and administration of stem cell

and exosome-based treatments to consumers, including Plaintiffs and members of the California Sub-Class.

238. **Unlawful Prong.** Defendant's conduct is "unlawful" within the meaning of § 17200 because it violates other laws, including:

1. The Federal Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S.C. § 321(g)(1), § 331(d), and § 355(a), in that Defendant introduces and delivers for introduction into interstate commerce unapproved "new drugs" — namely, exosome and stem cell–derived biologic products marketed for the treatment of disease and to affect the structure or function of the body — without FDA approval and without an Investigational New Drug Application. *See United States v. California Stem Cell Treatment Ctr., Inc.*, 117 F.4th 1213 (9th Cir. 2024);

2. California's Sherman Food, Drug, and Cosmetic Law, Cal. Health & Safety Code § 109875, *et seq.*, including § 111550 (prohibiting the sale or delivery of any "new drug" unless an FDA new-drug application is effective), § 111330 (prohibiting false or misleading drug labeling), and § 111440 (prohibiting the sale of adulterated drugs);

3. The California Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code § 1750, et seq., as alleged in the Seventh Claim for Relief; and

4. The California False Advertising Law ("FAL"), Cal. Bus. & Prof. Code § 17500, *et seq.*, in that Defendant has made untrue and misleading statements concerning the regenerative, restorative, and therapeutic capabilities of its products and services, which Defendant knew or, in the exercise of reasonable care, should have known were untrue or misleading.

239. **Unfair Prong.** Under the "balancing test," Defendant has engaged in unfair business practices. Defendant's conduct is "unfair" within the meaning of § 17200 because the gravity of the harm to Plaintiffs and members of the California Sub-Class — including economic loss of substantial out-of-pocket sums and the loss of the benefit of the bargain — outweighs any conceivable utility of Defendant's conduct, which has no legitimate utility.

240. Defendant's have engaged in unfair business practices under the "tethering test." Defendant's actions and omissions, as described herein, have violated fundamental public policies expressed by the California Legislature. Defendant's conduct offends established public policy, including the public policy embodied in the FDCA, the Sherman Law, the CLRA, and the FAL, each of which is intended to protect consumers from the marketing and sale of unapproved, unsubstantiated, and deceptively promoted medical products and services. The injury to consumers is substantial, is not outweighed by any countervailing benefit

to consumers or to competition and could not reasonably have been avoided by consumers because Defendant concealed material facts regarding the experimental nature, lack of FDA approval, and absence of reliable clinical substantiation of its treatments.

241. **Fraudulent Prong.** Defendant's conduct is "fraudulent" within the meaning of § 17200 because Defendant's affirmative misrepresentations and material omissions regarding the regenerative capacity, therapeutic efficacy, FDA-approval status, scientific substantiation, and safety of its stem cell and exosome treatments are likely to deceive — and in fact did deceive — reasonable consumers acting reasonably under the circumstances. Defendant's affirmative claims (including representations of specific exosome quantities such as "100 Billion," "110 Billion," and "250 Billion" exosomes per injection, and representations that its IV exosome therapy is the "fountain of youth") are not substantiated by reliable scientific evidence, and the disclaimers Defendant occasionally provides are not clear and conspicuous and do not cure the overall net impression created by Defendant's marketing.

242. Plaintiffs Sutton and Vakili, and members of the California Sub-Class, suffered injury in fact and lost money and property as a result of Defendant's unlawful, unfair, and fraudulent business acts and practices. Plaintiffs reviewed and reasonably relied on Defendant's representations in deciding to purchase

Defendant's treatments and would not have purchased Defendant's treatments — or would have paid significantly less — had Defendant truthfully and fully disclosed the experimental nature, lack of FDA approval, and absence of reliable scientific substantiation of its treatments.

243. Defendant's misrepresentations and omissions were material because they concerned the nature, regulatory status, scientific basis, quality, efficacy, and expected outcomes of treatments sold at substantial out-of-pocket cost, and would be material to any reasonable consumer.

244. Pursuant to Cal. Bus. & Prof. Code § 17203, Plaintiffs and the California Sub-Class seek an order: (a) requiring Defendant to disgorge and make restitution of all monies wrongfully obtained from Plaintiffs and members of the California Sub-Class; (b) enjoining Defendant from continuing to engage in the unlawful, unfair, and fraudulent business acts and practices described herein, including the further marketing, sale, and administration of unapproved stem cell, exosome, and related biologic products for the regenerative and therapeutic uses Defendant has advertised; (c) requiring Defendant to make corrective disclosures to past and prospective patients; and (d) awarding such other equitable relief as the Court deems just and proper.

245. Plaintiffs also seek reasonable attorneys' fees and costs pursuant to Cal. Code Civ. Proc. § 1021.5, as this action will confer a significant benefit on the

general public and on a large class of persons, the necessity and financial burden of private enforcement make an award appropriate, and such fees should not be paid out of the recovery.

**SIXTH CLAIM FOR RELIEF**
**Violation of the California Consumers Legal Remedies Act**
**Cal. Civ. Code § 1750, et seq.**
**(On behalf of Plaintiffs and the California Sub-Class)**

246. Plaintiffs repeat and re-allege the allegations in paragraphs 1-191 as if fully set forth herein.

247. The Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code § 1750, et seq., is a comprehensive statutory scheme that is to be liberally construed to protect consumers against unfair and deceptive business practices in connection with the conduct of business providing goods, property, or services to Consumers primarily for personal, family, or household use.

248. The CLRA prohibits unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer.

249. Plaintiffs Sutton and Vakili, and members of the California Sub-Class, are "consumers" within the meaning of Cal. Civ. Code § 1761(d) because they sought or acquired Defendant's services and products for personal, family, or household purposes.

250. Defendant is a "person" as defined by Civil Code §§ 1761(c) and 1770.

251. Defendant's stem cell, exosome, and related biologic treatments and the services associated with their administration constitute "goods" and "services" within the meaning of Cal. Civ. Code § 1761(a) and (b).

252. The transactions between Plaintiffs (and members of the California Sub-Class) and Defendant are "transactions" within the meaning of Cal. Civ. Code § 1761(e).

253. Defendant violated the CLRA by engaging in the following practices proscribed by Cal. Civ. Code § 1770(a) in connection with its sale of stem cell and exosome treatments:

(a)(5) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have, in violation of § 1770(a)(5);

(a)(7) Representing that goods or services are of a particular standard, quality, or grade when they are of another, in violation of § 1770(a)(7);

(a)(9) Advertising goods or services with intent not to sell them as advertised, in violation of § 1770(a)(9);

(a)(14) Representing that a transaction confers or involves rights, remedies, or obligations which it does not have or involve, including misrepresenting the scope and effect of the so-called "satisfaction" or "money-back" guarantee, in violation of § 1770(a)(14); and

(a)(16) Representing that the subject of a transaction has been supplied in accordance with a previous representation when it has not, in violation of § 1770(a)(16).

254. Defendant's deceptive acts and practices include, without limitation: (a) representing that its products and services would regenerate cartilage, repair joint tissue, halt or reverse degenerative joint disease, and provide a clinically meaningful and durable alternative to surgery, when the products and services have no such established capacity; (b) representing specific exosome quantities ("100 Billion," "110 Billion," "250 Billion") in a manner that conveyed enhanced efficacy and potency without scientific substantiation for any such dose-response relationship; (c) failing to disclose that no exosome or stem cell–derived product administered by Defendant has been approved or authorized by the FDA for the regenerative uses Defendant promoted; (d) failing to disclose that Defendant's products are investigational and experimental and that the supporting research is largely preclinical, heterogeneous, and unreliable as applied to Defendant's clinical practice; and (e) representing that Defendant would honor a satisfaction or money-back guarantee and then refusing to do so.

255. Plaintiffs Sutton and Vakili, and members of the California Sub-Class, reviewed and reasonably relied on Defendant's representations in deciding to purchase Defendant's treatments. The representations and omissions were material

to a reasonable consumer's decision to purchase the treatments at the prices Defendant charged. Plaintiffs would not have purchased Defendant's treatments — or would have paid significantly less — but for Defendant's misrepresentations and material omissions.

256. As a direct and proximate result of Defendant's violations of the CLRA, Plaintiffs and members of the California Sub-Class have suffered injury in fact and damages, including the loss of money and property paid to Defendant and the loss of the benefit of the bargain.

257. Pursuant to Cal. Civ. Code § 1780(a)(2) and (a)(5), Plaintiffs presently seek injunctive and declaratory relief and an order enjoining Defendant from continuing the unlawful methods, acts, and practices alleged herein. Concurrent with the filing of this Complaint, Plaintiffs are serving Defendant with notice in compliance with Cal. Civ. Code § 1782(a). After thirty (30) days have elapsed and if Defendant fails to provide an appropriate correction, repair, replacement, or other remedy as set forth in § 1782, Plaintiffs will amend this Complaint to seek actual damages, restitution, punitive damages, attorneys' fees and costs, and all other relief available under Cal. Civ. Code § 1780, on behalf of themselves and the California Sub-Class.

258. An affidavit of venue showing that this action has been commenced in the proper forum, as required by Cal. Civ. Code § 1780(d), will be filed in support of this claim if and to the extent applicable to the procedural posture of this action.

**SEVENTH CLAIM FOR RELIEF**
**Violation of New York General Business Law § 349**
**(Deceptive Acts and Practices)**
**(On behalf of Plaintiff Vakili and the New York Sub-Class)**

259. Plaintiffs repeat and re-allege the allegations in paragraphs 1-191 as if fully set forth herein.

260. Plaintiff Vakili brings this claim individually and on behalf of the New York Sub-Class.

261. New York General Business Law ("GBL") § 349 declares unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service" in New York.

262. A claim under GBL § 349 has three elements: (i) Defendant's conduct was consumer-oriented, (ii) Defendant's conduct was materially misleading, and (iii) Plaintiff suffered injury as a result of Defendant's conduct. Plaintiff Vakili and members of the New York Sub-Class satisfy each element.

263. **Consumer-Oriented Conduct.** Defendant's conduct was consumer-oriented because Defendant marketed, advertised, and sold its stem cell, exosome, and related regenerative biologic treatments to the public at large, including consumers in New York, through standardized website content, social-media

advertising, mass-distributed consultation materials, uniform informed-consent forms, and standardized communications by sales representatives. Defendant operates a clinic in New York at which it administers these treatments, including the August 22, 2025 injection administered to Plaintiff Vakili by Dr. Charles.

264. **Materially Misleading Conduct.** Defendant's conduct was materially misleading in a manner likely to mislead a reasonable consumer acting reasonably under the circumstances. Defendant's affirmative representations and material omissions, as described above, conveyed the false impression that Defendant's treatments were established, clinically substantiated regenerative therapies capable of producing meaningful and durable improvement in joint function, pain, and tissue repair, when in fact the treatments are investigational, lack FDA approval for the advertised uses, lack reliable clinical substantiation, and have not been shown to produce the regenerative outcomes Defendant promotes. Defendant's specific quantitative representations regarding exosome content (e.g., "110 Billion" and "250 Billion" exosomes per injection) and Defendant's representations regarding its "Patient Protection Policy" and money-back guarantee are likewise materially misleading.

265. **Injury.** Plaintiff Vakili and Sub-Class Members were injured as a result of Defendant's deceptive conduct. Plaintiff Vakili paid Defendant

approximately $27,000 for treatments that did not provide the represented regenerative benefits, suffered worsening pain, exacerbation of her fibromyalgia, and required additional medical care, including knee injections, physical therapy, prescription pain medication, and an interventional pain management procedure. Defendant further refused to honor its money-back guarantee. Members of the New York Sub-Class suffered analogous injuries.

266. Defendant acted intentionally, knowingly, and maliciously to violate New York's General Business Law, and recklessly disregarded Plaintiff Vakili and New York Sub-Class Members' rights. Defendant's deceptive and unlawful acts and practices complained of herein affected the public interest and consumers at large.

267. Pursuant to GBL § 349(h), Plaintiff Vakili and the New York Sub-Class are entitled to recover their actual damages, an injunction prohibiting Defendant's continuing deceptive acts and practices, and reasonable attorneys' fees. Because Defendant's violations were knowing and willful — as evidenced by Defendant's continued use of the same standardized misrepresentations even after Plaintiffs and other consumers complained — Plaintiff Vakili and the New York Sub-Class are also entitled to treble damages, up to $1,000 per violation, pursuant to GBL § 349(h).

**EIGHTH CLAIM FOR RELIEF**
**Violation of New York General Business Law § 350**
**(False Advertising)**
**(On behalf of Plaintiff Vakili and the New York Sub-Class)**

268. Plaintiffs repeat and re-allege the allegations in paragraphs 1-191 as if fully set forth herein.

269. New York General Business Law § 350 declares unlawful "[f]alse advertising in the conduct of any business, trade or commerce or in the furnishing of any service" in New York. "False advertising" includes advertising that is "misleading in a material respect," considering both representations made and material facts omitted. N.Y. Gen. Bus. Law § 350-a(1).

270. Defendant has engaged in advertising activity within New York, including by directing consumers to its website and social-media advertising, by distributing marketing materials and consultation scripts, and by operating a clinic in New York where the represented treatments are sold and administered.

271. Defendant's advertising is materially misleading because, as described above, Defendant has affirmatively represented that its stem cell, exosome, and related biologic products and services regenerate tissue, repair joints, restore cartilage, reduce inflammation, improve mobility, halt or reverse degenerative joint disease, and serve as an effective alternative to surgery, when those claims are not substantiated and are likely to mislead a reasonable consumer. Defendant has also omitted material facts, including the lack of FDA approval, the investigational and experimental nature of the products, and the absence of reliable clinical substantiation.

272. Plaintiff Vakili and members of the New York Sub-Class were exposed to and relied on Defendant's false and misleading advertising and were injured thereby in the form of out-of-pocket payments to Defendant, loss of the benefit of their bargain, and other ascertainable economic loss.

273. Pursuant to GBL § 350-e, Plaintiff Vakili and the New York Sub-Class are entitled to recover their actual damages or five hundred dollars ($500) per violation, whichever is greater, together with reasonable attorneys' fees. Because Defendant's violations were knowing and willful, Plaintiff Vakili and the New York Sub-Class are also entitled to treble damages, up to $10,000 per violation, pursuant to GBL § 350-e(3), as well as injunctive relief prohibiting Defendant's continuing false advertising.

## NINTH CLAIM FOR RELIEF
## Violations of the Georgia Uniform Deceptive Trade Practices Act
## Ga. Code Ann. §§ 10-1-370, *et seq*. ("Georgia UDTPA")
## (On Behalf of Plaintiffs and the Class)

274. Plaintiffs repeat and re-allege the allegations in paragraphs 1-191 as if fully set forth herein.

275. Defendant, Plaintiffs, and Class Members are "persons" within the meaning of the Georgia Uniform Deceptive Trade Practices Act ("Georgia DTPA"), Ga. Code Ann. § 10-1-371(5).

276. Defendant engaged in unfair and deceptive acts and practices in violation of the Georgia DTPA, Ga. Code Ann. § 10-1-372, which states in pertinent part that it is a deceptive trade practice to:

> (a)(5) Represent[] that goods or services have sponsorship, approval, characteristics, . . . uses, [or] benefits . . . that they do not have;
>
> (a)(7) Represent[] that goods or services are of a particular standard, quality, or grade . . . if they are of another; or
>
> (a)(12) Engage[] in any other conduct which similarly creates a likelihood of confusion or of misunderstanding.

277. Defendant engaged in deceptive trade practices in violation of the Georgia DTPA, Ga. Code Ann. § 10-1-372(a)(5), (7), and (12), by, among other things:

a. Representing that Defendant's stem cell, exosome, and related biologic treatments have characteristics, uses, and benefits that they do not have — including the ability to regenerate tissue, repair joints, restore cartilage, reduce inflammation, improve mobility, and serve as an effective alternative to surgery — when the treatments are experimental, investigational, not FDA-approved for the advertised uses, and not supported by reliable clinical evidence, in violation of § 10-1-372(a)(5) and (a)(7); and ; and

b. Engaging in other conduct creating a likelihood of confusion or misunderstanding, including by using clinical and scientific-sounding terminology such as "regenerative," "cellular regeneration," and "stem cells," by touting specific exosome quantities, and by omitting material facts regarding the investigational nature of the treatments, the absence of FDA approval, and the lack of reliable clinical substantiation, thereby misleading reasonable consumers into believing the treatments are established, evidence-based medical therapies, in violation of § 10-1-372(a)(12).

278. Plaintiffs and Class Members reasonably expected, based on Defendant's marketing representations, that Defendant's stem cell, exosome, and related biologic treatments were legitimate, clinically substantiated medical therapies capable of providing the regenerative and therapeutic benefits Defendant advertised, including joint repair, cartilage regeneration, reduced inflammation, improved mobility, and avoidance of more invasive procedures.

279. Plaintiffs and Class Members relied on Defendant to truthfully and accurately represent the nature, regulatory status, scientific basis, quality, efficacy, and expected outcomes of its treatments, including whether the treatments were FDA-approved, supported by reliable clinical evidence, and appropriate for the conditions for which they were marketed.

280. Plaintiffs and Class Members had no opportunity to independently evaluate the scientific or clinical evidence underlying Defendant's regenerative medicine claims, or to otherwise ascertain the truthfulness of Defendant's representations and omissions regarding the efficacy, regulatory status, and safety of its stem cell and exosome treatments.

281. Plaintiffs and Class Members relied to their detriment on Defendant's misrepresentations and deceptive omissions regarding the nature, quality, efficacy, and anticipated results of Defendant's stem cell and exosome treatments.

282. Had Defendant truthfully disclosed that its stem cell, exosome, and related biologic treatments were experimental, not FDA-approved for the advertised uses, and unsupported by reliable clinical evidence demonstrating the regenerative benefits Defendant promised, Plaintiffs and Class Members would not have purchased Defendant's treatments or would have paid significantly less.

283. As a direct and proximate result of Defendant's unfair and deceptive trade practices, Plaintiffs and Class Members suffered ascertainable losses, including but not limited to out-of-pocket payments for treatments that were not as represented, loss of the benefit of their bargain, additional medical expenses incurred as a result of the failure of Defendant's treatments to provide the represented benefits, and physical pain and discomfort.

284. Defendant continues to market and sell its stem cell, exosome, and related biologic treatments using the same or materially similar misrepresentations and omissions regarding the regenerative and therapeutic capacity, FDA-approval status, and scientific substantiation of its treatments, despite knowing that these representations lack reliable clinical support and that the treatments are not FDA-approved for the advertised uses.

285. Moreover, Defendant continues to represent and imply through its website, advertising, and patient-facing materials that its stem cell and exosome treatments are established, effective regenerative therapies, without clearly and conspicuously disclosing the investigational nature of the treatments, the absence of FDA approval for the advertised uses, or the lack of reliable clinical evidence supporting the regenerative outcomes Defendant promotes. Such continued representations place consumers at risk of the same economic and physical harm suffered by Plaintiffs and Class Members.

286. Plaintiffs and the Class are therefore entitled to injunctive relief because, among other things, Defendant continues to market and sell unapproved stem cell and exosome treatments using deceptive representations and material omissions, and absent injunctive relief, Defendant will continue to mislead consumers into purchasing experimental and unproven treatments at substantial out-of-pocket cost.

287. The Georgia UDTPA states that the "court, in its discretion, may award attorney's fees to the prevailing party if . . . [t]he party charged with a deceptive trade practice has willfully engaged in the trade practice knowing it to be deceptive." Ga. Code Ann. § 10-1-373(b)(2). Defendant willfully engaged in deceptive trade practices knowing them to be deceptive. Defendant knew or should have known that its stem cell, exosome, and related biologic treatments were not FDA-approved for the regenerative uses it advertised, that the treatments lacked reliable clinical substantiation, and that its marketing representations overstated the scientific support and expected benefits of the treatments. Despite this knowledge, Defendant continued to market and sell these treatments using the same or materially similar deceptive representations.

288. The Georgia UDTPA states that "[c]osts shall be allowed to the prevailing party unless the court otherwise directs." Ga. Code Ann. § 10-1-373(b). Plaintiffs and the Class are entitled to recover their costs of pursuing this litigation.

289. Plaintiffs and the Class seek all monetary and non-monetary relief allowed by the Georgia UDTPA, including injunctive relief and attorneys' fees.

**WHEREFORE**, Plaintiffs, individually and on behalf of the proposed Class, respectfully request that this Court enter an Order:

a. Certifying the Class as defined above, appointing Plaintiffs as class representatives and the undersigned as class counsel;

b. Declaring that Defendant's actions, as set forth herein, unjustly enriched Defendant;

c. For an order finding in favor of Plaintiffs and the Class on their claims for relief;

d. For prejudgment interest on all amounts awarded;

e. For an order of restitution and all other forms of equitable monetary relief;

f. For an injunction prohibiting the manufacture, marketing, sale, and clinical administration of stem cell therapy;

g. For an order awarding Plaintiffs and the Class their reasonable attorneys' fees and expenses and costs of suit pursuant to O.C.G.A. Section 13-6-11 and as otherwise allowed by law; and

h. Such other relief the Court may deem just and proper.

## **JURY TRIAL DEMANDED**

Plaintiffs demand trial by jury on all issues so triable.

Dated: July 22, 2026

Respectfully submitted by:

*/s/ MaryBeth V. Gibson*
MaryBeth V. Gibson
GA Bar No. 725843
**GIBSON CONSUMER LAW GROUP, LLC**
4279 Roswell Road
Suite 208-108
Atlanta, GA 30342

Tel: 678-642-2503
marybeth@gibsonconsumerlawgroup.com

Joseph Lyon (*Pro Hac Vice forthcoming*)
Clint Watson (*Pro Hac Vice forthcoming*)
**THE LYON FIRM, ALC**
2754 Erie Ave.
Cincinnati, Ohio 45208
Tel: (513) 381-2333
jlyon@thelyonfirm.com
cwatson@thelyonfirm.com

Brandon Wise (*Pro Hac Vice forthcoming*)
Domenica Russo (*Pro Hac Vice forthcoming*)
**PEIFFER WOLF CARR KANE CONWAY & WISE LLP**
One US Bank Plaza, Suite 1950
St. Louis, Missouri 63101
Tel: (504) 523-2434
bwise@peifferwolf.com
drusso@peifferwolf.com

*Attorneys for Plaintiffs and the Putative Class and Sub-Classes*